**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KEITH WALTER BULLARD,

     Petitioner,          Case No. 2:14-CV-12252

v.                     HONORABLE DENISE PAGE HOOD
                           CHIEF UNITED STATES DISTRICT JUDGE

SHANE JACKSON,[1]

     Respondent.
_____/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF
HABEAS CORPUS, DECLINING TO ISSUE A CERTIFICATE OF
APPEALABILITY, AND GRANTING LEAVE TO APPEAL *IN FORMA
PAUPERIS***

Keith Walter Bullard, ("Petitioner"), confined at the Earnest C. Brooks

Correctional Facility in Muskegon Heights, Michigan, filed a *pro se* petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he

challenges his conviction and sentence for criminal sexual conduct,

second-degree (person under 13), M.C.L.A. § 750.520c(1)(a).

Respondent filed an answer to the petition. As part of the answer,

respondent requested this Court to dismiss the petition on the ground that

petitioner's sixth claim, pertaining to the trial judge's utilization of factors to

_____

[1]The Court amends the caption to reflect the current warden of
petitioner's incarceration.

1

increase his minimum sentence that were not submitted to the jury, is

unexhausted.  In lieu of dismissing the petition for a writ of habeas corpus,

the Court held the petition in abeyance to allow petitioner to return to the

trial court to exhaust his sixth claim.  Rather than returning to the trial

court, petitioner requested that he be allowed to amend his petition to

delete his sixth unexhausted claim and to re-open the petition to the

Court's active docket. (Dkt. ## 14-16).  This Court reopened his habeas

petition and deleted the sixth claim.  For the reasons that follow, the

petition for a writ of habeas corpus is DENIED.

## I.  Background

Petitioner was originally charged with first-degree criminal sexual

conduct (person under the age of 13) and second-degree criminal sexual

conduct (person under the age of 13).  Following a jury trial, the first count

was dismissed by the court and the jury convicted petitioner of second-

degree criminal sexual conduct.

The victim was four years old at the time of the offense and will be

referred to as "B."  Her mother Kayla Scherret, age 23, and petitioner Keith

Bullard, age 42, were in a dating relationship in which they lived together

from April 2009 through November, 2009. (Tr. 6/7/2011.pp. 282-284, 291,

327).  Petitioner did not work and watched "B" while her mother worked milking cows. (*Id.* at 316-317).  Kayla's mother is Jane Scherret and her aunts are Janice Dohring and Joanne Kern. (*Id.* at 286-287).  Jane is the mother of Kevin and Kayla. (*Id.* at 315).  Kayla did laundry for herself and "B" at her mother's house. (*Id.* at 304-306, 311). Dohring's teen-age nephew Kevin (Jane's son), and daughter Elizabeth, occasionally babysits "B." (*Id.* at 314-315, 356).

Kayla had to work Thanksgiving week and planned to have "B" picked up on Wednesday to stay at "B's" grandmother's house through the weekend. (*Id.* at 292-293).  "B" always sleeps in her bedroom, in her own bed. (*Id.* at 285, 294).  On Tuesday, November 24, 2009, Kayla had to be at work.  "B" was adamant that Kayla not leave for work, but Kalya left "B" with petitioner.  Janice Dohring sent a text message to Kayla's phone, which is left in the apartment when Kayla went to work, to tell her that she was coming to pick up "B."  Aunt Janice was at the apartment to pick up "B" about 45 to 60 minutes later.  When she arrived she noticed that "B" was "very nervous, she was very scared, frightened."  Janice testified that she noticed that things in the home were "out of order."  "B's" bedding was on the couch, that "B" was not packed or ready to go, and that "B" was

"very scared to get near Keith." Petitioner placed dirty clothes from the bathroom into plastic bags while Janice got "B" ready to go, without changing "B's" clothes. Janice placed the plastic bags of dirty clothes in the trunk of her car and went to her sister's Jane's house so that Jane could see "B." (*Id.* at 296, 319-324). Janice left the plastic bag of dirty laundry in Jane's utility room. (*Id.* at 324). Jane washed the clothing later that day and threw out the plastic bag. (Tr. 6/8/2011, pp. 415-416). When Kayla returned home, petitioner told her that her aunt had picked up "B" earlier that day instead of Wednesday, as Kayla had planned. (Tr. 6/7/2011.p. 298).

"B" spent the night with Janice and her daughter, Elizabeth Dohring. Janice testified that "B" remained afraid. (*Id.* at 325-327). Her clothes were dirty and she smelled. Her underwear appeared dirty and "pee stained." (*Id.* at 345-347). She picked up the clothes that "B" had been wearing since leaving the apartment and placed them in her hamper, where they remained until the Friday after Thanksgiving Day. (*Id.* at 335-336). "B" slept with Janice, but had difficulty falling asleep, was frightened, clingy, and incontinent on and off on Wednesday and throughout Thanksgiving Day and into Friday. On Friday morning, Janice went to

work between 7:00 and 8:00 a.m. as a nursing assistant. (*Id.* at 329-334).

"B" was asleep when Janice left and her daughter Elizabeth (age 13) and

nephew Kevin (age 16) remained home with "B." (*Id.* at 334, Tr. 6/8/2011,

p. 372). Kevin watched "Finding Nemo" with "B" around noon while trying

to get "B" down for a nap. "B" was "whiny, crying and scared" and would

not let Kevin "leave her side at all." (Tr. 6/8/2011, pp. 365-366). While

trying to get her to calm down and nap, "B" told Kevin, "Uncle Kevin, do

you know what Keith did to me...Keith stuck his pee-pee in me." (*Id.* at

368). Kevin called his mom, Jane Scherret, who took "B" to the hospital.

(*Id.* at pp. 369, 407, 408).

After leaving the hospital, Jane Scherret stopped by her sister

Janice's house for "B's" toys and a basket of dirty laundry. Janice does

not have a washing machine. The clothes that "B" had on when she left

on Tuesday were among the items to launder. Jane called and informed

the hospital that she had the clothes. She was advised to place them in a

brown paper bag and take them to the hospital. (*Id.* at 410-414, 498).

Nurse Pamela Lueke performed an initial assessment when "B"

arrived at the hospital for evaluation on Friday. She testified that "B" did

not say much at first and when asked why she was there, she "did say she

was there because he hurted (sic) my heart." Lueke further testified that "B" said "he put his pee-pee in there," while pointing to her vagina between her legs "and that he stopped doing it when her aunt was coming to pick her up." (*Id.* at pp. 470-474, 490). A vaginal and rectal smear was obtained from "B." (*Id.* at pp. 480-481).

The Michigan State Police crime lab in Bridgeport conducted DNA tests on the underpants and procured a DNA sample from petitioner. (*Id.* at 525, 539). Sperm cells were found within the sample extracted from the underwear. (*Id.* at 545, 549-550). The DNA profile from the skin cell sample matched "B's" known DNA profile and the DNA profile from the sperm cells sample matched petitioner's. (*Id.* at 582-583).

The jury found petitioner not guilty of first-degree criminal sexual conduct, penile-vaginal penetration, but convicted petitioner of second-degree criminal sexual conduct. Petitioner was sentenced as a fourth-felony habitual offender, Mich. Comp. Laws § 769.12, and is currently serving a sentence of 14 – 30 years.

Petitioner filed a delayed application for leave to appeal. Petitioner's conviction was affirmed on appeal. *People v. Bullard,* No. 310854, (Mich. Ct. App. April 26, 2013), *lv. den* 495 Mich. 913; 840 N.W.2d 357 (2013).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. In prohibiting admission of defense expert testimony, the trial court violated the constitutional right to present a defense.

II. The trial court's improper admission of hearsay evidence violated due process rights.

III. Violation of Sixth Amendment right to confront witness.

IV. Violation of right to counsel.

V. Denied right to due process to a fair trial by denying motion to appoint an expert in forensic interviewing.

## II.  Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA), imposes the following standard of

review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court has explained that "[A] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,'and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) ((quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)(*per curiam*)).  "[A] state court's

8

determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103.

Petitioner raised his claims on his direct appeal. The Michigan Court of Appeals denied petitioner's application for leave to appeal on petitioner's direct appeal in a form order "for lack of merit in the grounds presented." The Michigan Supreme Court subsequently denied petitioner leave to appeal in a standard form order without any extended discussion. Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, as would warrant federal habeas relief, does not require that there be an opinion from the state court that explains the state court's reasoning. *Harrington*, 562 U.S. at 98. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no

reasonable basis for the state court to deny relief." *Id.* In fact, when a habeas petitioner has presented a federal claim to a state court and that state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99. That presumption may be overcome only when there is a reason to think that some other explanation for the state court's decision is more likely. *Id.* at 99-100.

In the present case, the AEDPA deferential standard of review applies to petitioner's claims where the Michigan Court of Appeals rejected petitioner's appeal "for lack of merit in the grounds presented" and the Michigan Supreme Court subsequently denied leave to appeal in a standard form order, because these orders amounted to a decision on the merits. See *Werth v. Bell*, 692 F.3d 486, 492-94 (6th Cir. 2012).

### III. Discussion

**A. Claim # 1. The right to present a defense through expert testimony.**

Petitioner claims that he should have been permitted to call an expert witness to testify that the victim's disclosure and descriptions of the sexual assault provides a textbook example of potentially tainted

testimony due to suggestive and coercive interview techniques and that the sperm could have been transferred by commingling petitioner's clothing and the victim's wet underwear in the clothes hamper.

An accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, and the right to present his own witnesses to establish a defense. This right is a fundamental element of the due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Crane v. Kentucky,* 476 U.S. 683, 690 (1986)("whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'")(internal citations omitted). However, an accused in a criminal case does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence. *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996). The Supreme Court, in fact, has indicated its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." *Crane,* 476 U.S. at 689. The Supreme Court gives trial court judges "wide latitude" to exclude

evidence that is repetitive, marginally relevant, or that poses a risk of harassment, prejudice, or confusion of the issues. *Id.* (citing *Delaware v. Arsdall,* 475 U.S. 673, 679 (1986)). Finally, rules that exclude evidence from criminal trials do not violate the right to present a defense unless they are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. 303, 308 (1998)(quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).

Under the standard of review for habeas cases as enunciated in § 2254(d)(1), it is not enough for a habeas petitioner to show that the state trial court's decision to exclude potentially helpful evidence to the defense was erroneous or incorrect. Instead, a habeas petitioner must show that the state trial court's decision to exclude the evidence was "an objectively unreasonable application of clearly established Supreme Court precedent." *See Rockwell v. Yukins,* 341 F.3d 507, 511-12 (6th Cir. 2003). Furthermore, "the Supreme Court has made it perfectly clear that the right to present a 'complete' defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions." *Id.* at p. 512.

A federal habeas court will not disturb a state court's exclusion of evidence on the ground of relevancy "unless the relevance and probative

value of such evidence is so apparent and great that excluding the evidence denies the petitioner the due process of law." *Jones v. Smith,* 244 F. Supp. 2d 801, 814 (E.D. Mich. 2003)(internal citations omitted). "The inquiry in reviewing a claim of improper exclusion of evidence is whether the evidence was rationally connected to the crime charged and, if its exclusion was so prejudicial as to deprive the defendant of a fundamentally fair trial." *Id.*

Petitioner contends that where the victim, "B," did not actually testify against him, the evidence against him consisted of vague statements made by her to her Uncle Kevin in an atmosphere where certain family members had a motive to fabricate charges against him. Petitioner further contends that because of devastating sperm cell evidence found in the victim's underwear, which corroborated the testimony, he only could counter this evidence with testimony from a defense expert who could hypothesize that the sperm cells could have been transferred onto the underwear through contact with another item of clothing. The trial court heard argument and found that there would have to be "some sort of scientific basis for her opinion," before allowing Julie Howenstein to testify as a defense expert. Howenstein testified that there are three possible

ways the semen stain could have been placed on the underwear. She provided two case studies in support of the defense theory that the semen could have transferred from petitioner's clothing to the victim's underwear through the commingling of garments in a clothing hamper: one 1996 Canadian case study and one 2001 Croatian case study, citing three (3) theories of the transfer of trace DNA material. Howenstein could not produce any studies from the United States.

Howenstein testified that the two studies provide three (3) possibilities of sperm transfer but there is no conclusive proof as to how the material actually arrived on the victim's underwear. Howenstein also testified that she reviewed Jodi Corsi's analysis of the DNA on the underwear and found the analysis to be correct. The trial court excluded the proposed testimony of defense expert Julie Howenstein, finding that there was no evidence that the underwear was commingled with any other garment, finding the testimony irrelevant. (Tr. 6/9/2011, pp. 608, 611-618).

At trial, the defense presented the transfer argument by questioning the prosecution's expert in its case-in-chief. The defense cross-examined extensively the prosecution's witness, Jodi Corsi, a forensic scientist for

the Michigan State Police. Corsi testified that finding sperm cells in underwear did not necessarily mean that a person committed a sexual act on the person who wore that underwear. (Tr. 6/8/2011, p. 556). Corsi also testified (consistent with Howenstein's hypothesis) that it was possible that a soiled pair of underwear that came into contact with dried sperm "could then make the sperm cell wet so that it was more easily transferred." (*Id.* at 567). The defense established that there were numerous ways for the sperm cells to have gotten into the victim's underwear. Furthermore, the trial court granted the defense motions for funds to call a DNA expert to assist in the preparation of petitioner's defense. (Tr. 1/10/2011, p. 45)(Up to $ 1,500.00 and to petition the court in advance if the cost will be more).

The prosecution's expert witness testified that the presence of sperm did not conclusively establish that there was contact with the victim and that sperm could have been transferred from another article of clothing onto the underwear. Because the proposed testimony of the defense expert did not differ from the testimony given by the prosecution's expert, the proposed testimony would have little, if any, relevant value. The trial court's decision to preclude defense counsel

from calling Julie Howenstein as a defense expert did not violate petitioner's right to confront the statements made by the victim to Kevin Scherret or to present a defense, because the evidence was only remotely relevant to impeach the victim's credibility. *See Farley v. Lafler,* 193 F. App'x 543, 546 (6th Cir. 2006). Although "[t]he Confrontation Clause places meaningful limits on a trial judge's ability to exclude evidence under a state's rules of evidence, those limits are not relevant when the information in question has virtually no probative value[,]." *Id.* at 547.

Finally, the trial court's exclusion of Howenstein's testimony was not so egregious that it effectively denied petitioner a fair trial, in light of the fact that petitioner was not barred from impeaching the victim's credibility. *See Fleming v. Metrish*, 556 F.3d 520, 535-36 (6th Cir. 2009). Counsel elicited testimony from the prosecution's expert witness to the effect that the sperm could have been placed on the underwear in a number of ways, including transfer when wet underwear comes in contact with dry sperm. The defense also elicited testimony from the prosecution's expert that the finding of sperm on the underwear is not conclusive evidence of sexual contact with the individual who wore the underwear. With the

16

quantum of evidence on the defense theory in the record, this Court concludes that petitioner was afforded "a meaningful opportunity to present a complete defense." *Allen v. Howes,* 599 F. Supp. 2d 857, 873 (E.D. Mich. 2009)(citing *Crane*, 476 U.S. at 690 (citation and internal quotations omitted)). Petitioner is not entitled to relief on his first claim.

**B. Claims ## 2 and 3. The hearsay evidence claim and the Sixth Amendment right to confront witnesses claim.**

Petitioner next contends that the trial court erred in permitting the introduction of out of court statements made by "B" to Kevin Scherret and to Nurse Lueke on the ground that such statements were inadmissible hearsay. Petitioner further contends that such statements did not qualify as prior consistent statements that would have been admissible pursuant to M.R.E. 801(d)(1)(b), because they were made three days after the alleged assault and after the victim had a motive to fabricate her allegations against petitioner. In his third claim, petitioner alleges that admission of the statements violate his due process rights under the Sixth Amendment right to confrontation. The Court will consolidate the claims because they are interrelated.

In his second claim, petitioner alleges that the trial court violated his due process rights by admitting hearsay evidence in the form of

statements made by "B" to Kevin Scherret, while watching "Finding Nemo," and to Nurse Lueke at the hospital.

It is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A federal court is limited in federal habeas review to deciding whether a state court conviction violates the Constitution, laws, or treaties of the United States. *Id.* Thus, errors in the application of state law, especially rulings regarding the admissibility of evidence, are usually not questioned by a federal habeas court. *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000); *see also Bridinger v. Berghuis,* 429 F. Supp. 2d 903, 908-09 (E.D. Mich. 2006)(federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process).

The admissibility of evidence under Michigan's hearsay rules is not cognizable in a habeas corpus proceeding. *See Byrd v. Tessmer,* 82 F. App'x 147, 150 (6th Cir. 2003); *see also Rhea v. Jones*, 622 F. Supp. 2d 562, 589 (W.D. Mich. 2008); *Cathron v. Jones,* 190 F. Supp. 2d 990, 996 (E.D. Mich. 2002)(petitioner's claim that state court erred in admitting hearsay testimony under state evidentiary rule governing declarations

18

against penal interest not cognizable in federal habeas review, where the claim alleged a violation of state law, not a violation of federal constitutional rights).  Therefore, the admission of this evidence in violation of Michigan's rules of evidence would not entitle petitioner to relief.  Petitioner's claim about the admission of statements that the victim made to Kevin Scherret and Nurse Lueke in violation of Michigan's hearsay rules involve at best an error of state law that is not cognizable in federal habeas review. *See Regan v. Hoffner,* 209 F. Supp. 2d 703, 715 (E.D. Mich. 2002).  Petitioner is not entitled to relief on his second claim.

In his third claim, petitioner contends that the admission of "B's" out-of-court statements to her uncle and to Nurse Lueke, as well as the hospital records and statements taken at the hospital, violated his right to confrontation because the victim was not present in court to testify.

Out-of-court statements that are testimonial in nature are barred by the Sixth Amendment Confrontation Clause unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court. *See Crawford v. Washington,* 541 U.S. 36 (2004).  However, the Confrontation Clause is not implicated, and thus does not

19

need not be considered, when non-testimonial hearsay is at issue. *See Davis v. Washington*, 547 U. S. 813, 823-26 (2006); *see also Desai v. Booker,* 538 F.3d 424, 425-26 (6th Cir. 2008). In holding that the Sixth Amendment right to confrontation does not apply to non-testimonial statements, the Supreme Court stated:

> "The text of the Confrontation Clause reflects this focus [on testimonial hearsay]. It applies to 'witnesses' against the accused-in other words, those who 'bear testimony.' 1 N. Webster, An American Dictionary of the English Language (1828). 'Testimony,' in turn, is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.' *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."

*Davis,* 547 U.S. at 823-24 (quoting *Crawford,* 541 U.S. at 51).

"B's" out-of-court statements were not testimonial and thus their admission at petitioner's trial did not violate the Confrontation Clause.

First, "B" was a four year old minor child who did not make these statements to the police to initiate a criminal investigation but instead made these statements to her uncle and a nurse.

In *Ohio v. Clark*, 135 S. Ct. 2173, 2181 (2015), the Supreme Court held that a three-year-old domestic abuse victim's statements to teachers at his preschool identifying defendant, who was his mother's boyfriend, as

the person who had caused his injuries were not testimonial.  The Court

further found that the Confrontation Clause did not bar the admission of

the statements at defendant's trial when the victim failed to testify.  The

Supreme Court concluded that the primary purpose of the statements

was not to create evidence for the defendant's prosecution, but rather the

statements occurred in the context of an ongoing emergency involving

suspected child abuse, and were aimed at identifying and ending the

threat. *Id.*  The Supreme Court observed that: "Statements by very young

children will rarely, if ever, implicate the Confrontation Clause." *Id.,* at

2182.  The rationale being that "Few preschool students understand the

details of our criminal justice system." *Id.*  "Thus, it is extremely unlikely

that a 3–year–old child in L.P.'s position would intend his statements to

be a substitute for trial testimony.  On the contrary, a young child in these

circumstances would simply want the abuse to end, would want to protect

other victims, or would have no discernible purpose at all." *Id.*

The primary purpose of "B" making these statements was not to

initiate a prosecution, but rather in the context of reporting an ongoing

emergency, namely, petitioner's continued sexual abuse or to report the

abuse because she simply wanted it to end.

Secondly, "B's" out-of-court statements made to her uncle did not qualify as testimonial statements covered by the Confrontation Clause because they were remarks made to a relative and not made to law enforcement.  Testimonial statements do not include remarks made to family members or acquaintances, business records, or statements made in furtherance of a conspiracy. *Crawford,* 541 U.S. at 51-52, 56; *see also Desai v. Booker,* 538 F.3d at 427; *Jackson v. Renico,* 179 F. App'x 249, 255 (6th Cir. 2006).

"B's" statements to Nurse Lueke were non-testimonial because they were made for the purpose of medical treatment.

In *Giles v. California,* 554 U.S. 353, 376 (2008), the Supreme Court suggested, albeit in dicta, that statements made by the victims of domestic abuse to their physicians in the course of receiving medical treatment did not qualify as testimonial statements that would be excluded by the Confrontation Clause.  Courts have held that out-of-court statements made by victims to their doctors are non-testimonial when they are made for the purpose of diagnosis and treatment, rather than to inculpate the defendant. *See Moses v. Payne,* 555 F.3d 742, 755 (9th Cir. 2009); *see also U.S. v. Santos,* 589 F.3d 759, 763 (5th Cir.

2009)(statements made for the purposes of obtaining medical treatment during an ongoing emergency are not testimonial, for Confrontation Clause purposes); *United States v. Peneaux,* 432 F.3d 882, 896 (8th Cir. 2005)(where statements are made to a physician seeking to give medical aid in the form of diagnosis or treatment, they are presumptively nontestimonial, for purpose of a Confrontation Clause claim).

In *United States v. Barker*, 820 F.3d 167, 171-72 (5th Cir. 2016), the Fifth Circuit held that out-of-court statements by a child victim to a sexual assault nurse examiner were non-testimonial, and therefore, their admission in a prosecution for possession of child pornography and attempt to receive child pornography did not violate defendant's Sixth Amendment rights under the Confrontation Clause. The Fifth Circuit concluded that the primary purpose of the conversation between the nurse and the victim in the emergency room was to medically evaluate and treat the victim. The victim's statements pertaining to the circumstances of abuse were relevant to ensuring she would not be discharged into the custody of the abuser, and the victim was four and a half years old. Likewise, in this case, the admission of "B's" out-of-court statements to Nurse Lueke did not violate petitioner's right to

confrontation.  The statements were made for medical treatment.

Any error in the admission of "B's" out-of-court statements was harmless error.  A Confrontation Clause error is subject to a harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).  The standard for showing harmless error on collateral review is "considerably less favorable" to a habeas petitioner than the standard which is applied on direct review.  On direct review, before a federal constitutional error can be held harmless, the court must be able to declare that the error was harmless beyond a reasonable doubt.  However, the harmless error test for collateral review is different.  A federal court can grant habeas relief only if the trial error had a substantial and injurious effect or influence upon the jury's verdict. *Ford v. Curtis,* 277 F.3d 806, 809 (6th Cir. 2002)(quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993)).  Under this standard, a habeas petitioner is not entitled to habeas relief unless he can establish that the trial error resulted in "actual prejudice." *Id.*  A federal habeas court can grant habeas relief only if a habeas petitioner carries the burden of showing that a Confrontation Clause error had a substantial and injurious effect or influence on the jury's verdict. *Bulls v. Jones,* 274 F.3d 329, 335 (6th Cir. 2001).

24

In the present case, the apartment was disorganized with "B's" bedding on the couch" when Aunt Janice went to pick "B" up two days before Thanksgiving. "B" always slept in her own bed in her own bedroom. "B" was clingy and nervous when Janice arrived and throughout the days leading up to the statement made to Uncle Kevin. The clothing that "B" wore to Aunt Janice's house were taken off and placed in Janice's clothing hamper later that night when she gave "B" a bath. Petitioner's DNA was found on the underwear that "B" wore to Aunt Janice's house, which was later placed in Janice's clothing hamper.

In light of the significant amount of evidence against petitioner, the admission of "B's" out-of-court statements to Kevin Scherret and Nurse Lueke were harmless error. Petitioner is not entitled to habeas relief on his third claim.

### C. Claim # 4. The substitution of counsel claim.

Petitioner claims that he was denied his Sixth Amendment right to counsel when the judge refused to substitute counsel. The record reflects that, unknown to defense counsel, petitioner wrote a letter to the court complaining about defense counsel's representation and requesting substitute counsel. In response, defense counsel filed a motion to

withdraw, based on a lack of trust and citing to a breakdown in the attorney/client relationship. (Tr. 4/13/2011, p. 2). The trial court held an extensive hearing on defense counsel's motion to withdraw. Petitioner indicated that he thought defense counsel's representation was inadequate because counsel did not challenge the unsworn testimony of the victim in his motions, and that the testimony should not have been considered in binding petitioner over for trial. The trial court judge explained the bindover procedure, indicating that the weighing of evidence occurs at the trial stage. (*Id.* at 6-8). Petitioner continued to express his dissatisfaction with defense counsel but did not provide an additional basis for his dissatisfaction. The trial court judge granted the motion to withdraw, but with the stipulation that counsel would remain as standby counsel to provide advice as needed during trial. (*Id.* at 12-13, 43).

On May 2, 2011, one day before trial, petitioner renewed his request for the appointment of new counsel and trial counsel again filed a motion to withdraw. The trial court judge stated on the record that an order allowing the withdrawal of counsel had not been entered following the last hearing. Petitioner was then told that he had the right to be represented or to waive counsel and represent himself. Petitioner stated numerous times

on the record, "I don't trust him and I don't want him as my attorney" during the hearing. The record also reflects that petitioner did not want to represent himself and wanted to be represented by an attorney. (Tr. 5/2/2011, pp. 3, 7, 8, 11-12, 24-25). The trial court judge denied the motion to withdraw finding that petitioner chose to be represented by counsel. Due to petitioner's strenuous objections, the trial court judge inquired as to whether petitioner preferred to make his own opening statement and examine the witnesses at his jury trial, which was scheduled to begin the following day. Petitioner stated "I can't represent myself," which resulted in the trial court judge making a finding that trial counsel would represent petitioner the following day at trial. (*Id.* at 25, 27).

The Sixth Amendment right to the assistance of counsel does not guarantee a criminal defendant that he or she will be represented by a particular attorney. *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1351 (6th Cir. 1993)(citing *Caplin & Drysdale v. United States,* 491 U.S. 617, 624 (1989)). A criminal defendant who has the desire and the financial means to retain his own counsel "should be afforded a fair opportunity to secure counsel of his own choice." *Id.* (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)). Indeed, "[t]he Sixth Amendment

guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *U.S. v. Gonzalez-Lopez,* 548 U.S. 140, 144 (2006)(quoting *Caplin & Drysdale,* 491 U.S. at 624-25).  However, while a criminal defendant who can afford his or her own attorney has a right to a chosen attorney, that right is a qualified right. *See Wheat v. United States,* 486 U.S. 153, 159 (1988). Stated differently, the right to counsel of one's own choice is not absolute. *See Wilson v. Mintzes,* 761 F.2d 275, 280 (6th Cir. 1985).  "Although a criminal defendant is entitled to a reasonable opportunity to obtain counsel of his choice, the exercise of this right must be balanced against the court's authority to control its docket." *Lockett v. Arn,* 740 F.2d 407, 413 (6th Cir. 1984); *see also Gonzalez-Lopez,* 548 U.S. at 151-52)("Nothing we have said today casts any doubt or places any qualification upon our previous holdings that limit the right to counsel of choice and recognize the authority of trial courts to establish criteria for admitting lawyers to argue before them...  We have recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar.")(internal citations omitted).  Finally,

the right to counsel of choice may not be used to unreasonably delay a trial. *See Linton v. Perini,* 656 F.2d 207, 209 (6th Cir. 1981).

"Because a trial court's decision on substitution is so fact-specific, it deserves deference; a reviewing court may overturn it only for an abuse of discretion." *Martel v. Clair*, 565 U.S. 648, 663-64 (2012).

The trial court twice conducted a hearing on petitioner's request for substitute counsel and trial counsel's motion to withdraw. The day before his jury trial, petitioner stated numerous times that he did not trust his attorney and that he wanted new counsel. Petitioner did not state any rational basis for his lack of trust or any rational basis for the appointment of new trial counsel. The Sixth Amendment, while guaranteeing petitioner the right to counsel, does not mandate that new trial counsel be appointed because a defendant dislikes or does not trust his court appointed counsel. Petitioner is not entitled to habeas relief on his substitution of counsel claim because "no Supreme Court case has held that 'the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts of interest, but with whom the defendant refuses to cooperate because of dislike or distrust.'" *Smith v. Adams*, 506 F. App'x. 561, 564 (9th Cir. 2013)(quoting *Larson v. Palmateer*, 515 F.3d 1057,

1067 (9th Cir. 2008)(quoting *Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir.2008)(en banc)).

Furthermore, the Sixth Circuit has noted that when "the granting of the defendant's request [for a continuance to obtain new counsel] would almost certainly necessitate a last-minute continuance, the trial judge's actions are entitled to extraordinary deference." *U.S. v. Whitfield*, 259 F. App'x 830, 834 (6th Cir. 2008)(quoting *United States v. Pierce*, 60 F.3d 886, 891 (1st Cir.1995)).  In the present case, petitioner stated that he did not trust his court appointed counsel and wanted new counsel to be appointed.  Petitioner's distrust was based on his belief that defense counsel's representation was inadequate because he did not challenge the unsworn testimony of the victim in his motions, and because the statements were used in binding petitioner over for trial. (Tr. 4/13/2011, pp. 6-8).  This Court has already found that the statements did not violate petitioner's rights under the Confrontation Clause.  Petitioner continued to express his dissatisfaction with defense counsel but did not provide an additional basis for his dissatisfaction.  Petitioner's bad relationship with trial counsel "was attributable to their differing opinions as to trial strategy" as well as petitioner's "subjective distrust, neither of which is a suitable

ground for habeas relief." *Smith*, 506 F. App'x at 564. *See also United States v. White*, 451 F.2d 1225, 1226 (6th Cir. 1971)(refusal to appoint substitute counsel on morning of trial when defendant claimed that he lacked confidence in his court-appointed counsel did not constitute abuse of discretion). There is "No Supreme Court decision [which] suggests that a criminal defendant is entitled to a new lawyer simply because the defendant loses confidence in his appointed attorney." *Clark v. Curtin*, No. 13-13616, 2016 WL 1594374, at *5 (E.D. Mich. Apr. 21, 2016). The record in this case does not demonstrate any specific disagreements between petitioner and his attorney rising to the level of a conflict sufficient to justify the substitution of counsel. *See United States v. Sullivan*, 431 F.3d 976, 981 (6th Cir. 2005). Petitioner was not entitled to substitute counsel because his complaints against counsel involved differences of opinion regarding strategy rather than any irreconcilable conflict or total lack of communication. *See e.g. Adams v. Smith*, 280 F. Supp. 2d 704, 720 (E.D. Mich. 2003).

Finally, petitioner is unable to show that he was prejudiced by the failure of the trial court to grant substitute counsel, in light of the fact that he received effective assistance of counsel at trial. *United States v.*

*Vasquez,* 560 F.3d 461, 468 (6th Cir. 2009). "The strained relationship"
between petitioner and his attorney was not a "complete breakdown in
communication" that prevented the petitioner from receiving an adequate
defense, in that the record establishes that counsel made an opening
argument, extensively cross-examined the witnesses, and made a closing
argument. *Id.* As a result, petitioner failed to establish good cause for the
substitution of counsel, where he failed to show that the conflict between
himself and his attorney was so great that it resulted in a total lack of
communication which denied petitioner of an adequate defense. *See
United States v. Jennings*, 83 F.3d 145, 149 (6th Cir. 1996). Petitioner is
not entitled to relief on his right to substitution of counsel claim.

### D. Claim # 5. The expert witness claim.

Petitioner next claims that the trial court denied him his rights to due
process and equal protection of the law when the trial court denied trial
counsel's motion for funds to appoint a psychologist in forensic
interviewing to assist him in the preparation for trial.

Petitioner sought a psychologist to testify in connection with the
family dynamics and relationships between the family members and
petitioner. The trial court judge denied counsel's motion for funds and

found that a psychologist's testimony as to false allegations made by child witnesses would not be of assistance in petitioner's defense. (Tr. 1/10/2011, pp. 46-47). Defense counsel extensively examined the dislike of petitioner by certain family members and the closeness of the relationship between "B" and her grandmother. An expert in forensic interviewing would not have added to petitioner's defense.

Furthermore, while the Supreme Court recognizes a criminal defendant's limited right to the assistance of an expert witness in raising an insanity defense, *see Ake v. Oklahoma*, 470 U.S. 68, 77 (1985), there is no Supreme Court precedence to support petitioner's claim that he had a right to a psychologist in forensic interviewing to prepare for trial or assist in analyzing issues pertaining to family dynamics. The Supreme Court has not addressed a defendant's entitlement to a court-appointed expert outside the context of an insanity defense. Since its decision in *Ake*, the Supreme Court has not taken the opportunity to "determine as a matter of federal constitutional law what if any showing would have entitled a defendant to assistance of other types of experts." *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1 (1985). The trial court's denial of funds to appoint a psychologist in forensic interviewing was not contrary to or an

unreasonable application of clearly established Supreme Court precedent.
Petitioner is not entitled to relief on his fifth claim.

## IV. Conclusion

For the reasons discussed, the petition for a writ of habeas corpus is
denied.

In order to obtain a certificate of appealability, a prisoner must make
a substantial showing of the denial of a constitutional right. 28 U.S.C. §
2253(c)(2). To demonstrate this denial, the applicant is required to show
that reasonable jurists could debate whether, or agree that, the petition
should have been resolved in a different manner, or that the issues
presented were adequate to deserve encouragement to proceed further.
*Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court
rejects a habeas petitioner's constitutional claims on the merits, the
petitioner must demonstrate that reasonable jurists would find the district
court's assessment of the constitutional claims to be debatable or wrong.
*Id.* at 484. "The district court must issue or deny a certificate of
appealability when it enters a final order adverse to the applicant." Rules
Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

This Court denies a certificate of appealability because reasonable

jurists would not find this Court's assessment of the claims to be debatable or wrong. *See Slack v. McDaniel*, 529 U.S. at 484.  Petitioner may, however, proceed *in forma pauperis* on appeal because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V.  <u>ORDER</u>

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE**.

IT IS FURTHER ORDERED That a certificate of appealability is **DENIED**.

IT IS FURTHER ORDERED that the petitioner will be **GRANTED** leave to appeal *in forma pauperis.*

<u>S/Denise Page Hood</u>
Denise Page Hood
Chief Judge, United States District Court

Dated:  May 31, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 31, 2018, by electronic and/or ordinary mail.

<u>S/LaShawn R. Saulsberry</u>
Case Manager